IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 20, 2015 Session


**HCA HEALTH SERVICES OF TENNESSEE, INC., ET AL. v. BLUECROSS BLUESHIELD OF TENNESSEE, INC.**


**Appeal from the Chancery Court for Davidson County**
**No. 10896II     Carol L. McCoy, Chancellor**

_____


**No. M2014-01869-COA-R9-CV – Filed June 9, 2016**

_____


Interlocutory appeal in suit brought by healthcare corporations to recover costs for emergency medical services rendered to patients participating in Defendant's insurance plans. We conclude that the Employee Retirement Income Security Act ("ERISA") preempts plaintiffs' state-law cause of action based on implied-in-law contract; that we are without subject matter jurisdiction to rule on whether Plaintiffs should be deemed to have exhausted the insurance company's appeals process and therefore decline to consider whether summary judgment should have been granted on the defense of failure to exhaust administrative remedies; that Plaintiff is not entitled to relief under an implied-in-law contract cause of action as to those plans which are not governed by ERISA based upon the duties imposed on the parties by state and federal law; that the insurance company should have been granted summary judgment on certain coverage claims arising from plans not governed by ERISA because Plaintiffs failed to exhaust grievance procedures; that Tenn. Code Ann. § 56-7-110(b) does not bar coverage claims; and that 47 coverage claims were improperly included in this lawsuit and should have been dismissed on summary judgment. Accordingly, we affirm in part, reverse in part, and vacate in part the lower court's order and remand for further proceedings.

**Tenn. R. App. P. 9 Interlocutory Appeal; Judgment of the Chancery Court**
**Affirmed in Part, Reversed in Part, Vacated in Part, and Remanded**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which ANDY D. BENNETT and W. NEAL MCBRAYER, JJ., joined.

Richard C. Rose, Robert F. Parsley, James T. Williams, Chattanooga, Tennessee, for the appellant, BlueCross BlueShield of Tennessee, Inc.

David A. King and Kinika L. Young, Nashville, Tennessee, for the appellees, HCA Health Services of Tennessee, Inc., Hendersonville Hospital Corporation, Central Tennessee Hospital Corporation, and HTI Memorial Hospital Corporation.

## OPINION

### I.    FACTUAL AND PROCEDURAL BACKGROUND

This interlocutory appeal involves the payment of claims for healthcare services provided in Plaintiffs' hospital emergency rooms to participants in Defendant's insurance plans.

Plaintiffs (collectively, "HCA") are Tennessee corporations that own and operate eight hospitals in Middle Tennessee under the name Tristar Health System. Defendant BlueCross BlueShield of Tennessee ("BCBST") sells health insurance policies to individuals as well as to participants in employee welfare benefit plans, which are established or maintained by private employers or employee organizations and governed by the federal Employee Retirement Income Security Act ("ERISA").[1] BCBST also provides policies to the employees of churches and state or local governments; these insurance policies are not governed by ERISA. *See* 29 U.S.C. § 1003.

BCBST contracts with healthcare providers, such as HCA, to serve patients who are participants in BCBST's insurance plans. In Tennessee BCBST maintains two networks of healthcare providers which are available to participants: Networks S and P. Network P offers participants a wide variety of practitioners, hospitals, and other providers; in contrast, Network S costs less and has fewer providers than Network P. As a provider of healthcare, HCA has entered into an agreement with BCBST, known as a network agreement, to provide healthcare services to participants in the Network P plans; no similar agreement exists with respect to participants in Network S plans.

HCA has treated thousands of participants of BCBST's S and P networks in its emergency rooms. Prior to being discharged, each participant signed a "Conditions of Admission Agreement" in which the participant assigned the benefits from the plan to HCA. Based on this assignment, HCA sent bills for its services directly to BCSCT, expecting BCBST to pay the charges, minus any co-payment for which the patient was responsible. When BCBST determined that the situation was a true medical emergency, it paid HCA's bill in full for services rendered to Network S participants. However, for

---

[1] ERISA is codified at 29 U.S.C. 1001 *et. seq.*, and regulates employee benefit plans by "requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts." 29 U.S.C. § 1001.

claims that BCBST determined were not true medical emergencies, BCBST did not pay the full amount of the bill.

Being disappointed with BCBST's reimbursement for emergency room services provided to Network S participants when BCBST determined that the situation was not an emergency, HCA filed suit against BCBST on June 1, 2010, alleging that BCBST "systematically paid substantially less than the Hospitals' usual and customary charges for Network S patients . . . generally a small percentage of charges." HCA asserted causes of action for implied-in-law contract and breach of contract and sought actual damages of "at least $7.8 million" for the services rendered to Network S participants at the hospitals since January 1, 2007. The first amended complaint added a cause of action for a declaratory judgment that, under the plan documents, BCBST "must reimburse the hospitals for at least 80% of full-billed usual and customary charges" and "no longer apply a 'Maximum Allowable Charges' limitation, or any similar limitation, to reduce the amount owed on full-billed usual and customary charges" for emergency services provided to Network S patients. HCA amended the complaint a second time to add, within its breach of contract cause of action, an action to recover benefits as assignee of the participants' benefits pursuant to the civil recovery enforcement provision of ERISA, 29 U.S.C. § 1132(a)(1)(B).

In due course, BCBST moved for partial summary judgment, on the grounds that: (1) ERISA preempted HCA's state law cause of action for unjust enrichment; (2) all but 145 of the 4,037 ERISA benefits claims were subject to dismissal because HCA failed to exhaust administrative remedies; (3) federal courts had exclusive jurisdiction of and HCA lacked standing to pursue the matters raised in the declaratory judgment action; (4) that, with respect to HCA's unjust enrichment cause of action: express contracts already governed the subject matter, HCA failed to exhaust its remedies against the network S participants, and HCA failed to confer a benefit on BCBST; (5) claims for which HCA received any payment from BCBST on or before November 30, 2008 were time-barred under Tenn. Code Ann. § 56-7-110(b) and should be excluded from the suit; (6) Plaintiff had failed to exhaust administrative grievance procedures governing the non-ERISA plans, which should result in dismissal of 540 claims; and (7) the 112 Network P claims should be dismissed because the parties have agreements that govern these claims.

With respect to BCBST's contention that HCA failed to exhaust administrative remedies, HCA moved for partial summary judgment on the ground that "[t]he undisputed facts show that the notices of adverse benefit determination and denial letters for the claims at issue do not provide the information required by ERISA regulations" and that, in accordance with 29 C.F.R. § 2560.503-1(l),[2] the trial court should deem that HCA had exhausted administrative remedies.

---

[2] 29 C.F.R. § 2560.503-1(l) states:

The trial court entered a Memorandum Opinion and Order on January 9, 2014, followed by a revised Memorandum and Order on April 22, 2014. In the revised order, the Chancellor held as follows:

> BlueCross/BlueShield is granted partial summary judgment dismissing the Hospitals' state law claims because ERISA is the exclusive remedy for all claims relating to an ERISA plan and neither the Hospital nor the Court may avoid the provisions of that statue by reference to a non-ERISA cause of action.
>
> BlueCross/BlueShield is denied partial summary judgment as to the Hospitals' claim for declaratory judgment because in the second amended complaint, the Hospitals seek a declaration of rights under the derivative claim[3] regarding the proper construction of the Network S plan documents, the assignment of benefits, BlueCross/BlueShield's internal policy documents and its appeal process and its application of undeclared and/or unwritten criteria for denying claims. To the extent that the Hospitals' request for a declaratory judgment is premised on contracts implied-in-law, ERISA provides the exclusive remedy and accordingly, that portion of the Hospitals' request for declaratory judgment is dismissed.
>
> BlueCross/BlueShield is denied partial summary judgment based on the Hospitals' alleged failure to exhaust mandatory administrative remedies under the ERISA plans. Any decision regarding ERISA benefit claims, assignments, appeals procedures, flawed or otherwise, is governed by ERISA and shall be resolved upon a full hearing, not by summary judgment. This Court's previous analysis that the Hospitals' implied-in-

---

Failure to establish and follow reasonable claims procedures. In the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of [ERISA, codified at 29 U.S.C. § 1132(a)] on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim.

[3] The trial court explained in a footnote that HCA's claims "are characterized as derivative claims because they are based upon the assignment of benefits executed by patients to the Hospitals." We adopt this characterization and will refer to HCA's breach of contract cause of action as the "derivative cause of action."

HCA's *quantum meruit*/implied contract/unjust enrichment cause of action does not rely upon patients' assignments of benefits but rather on the benefit HCA alleges it as conferred on BCBST directly in the absence of a contract between the parties regarding network S patients; accordingly, we will refer the *quantum meruit* cause of action as the "direct cause of action."

law contract claim did not require reference to BlueCross/BlueShield's procedures for administrative appeals, assignments or benefit claims and was not pre-empted by ERISA was in error. Upon review of the pleadings, the earlier memoranda, the supplemental memoranda and arguments made by the parties at the hearing on the motions to alter or amend, this Court is persuaded that ERISA is the exclusive remedy for all claims relating to ERISA plans and therefore, BlueCross/BlueShield's motion for partial summary judgment is appropriate and granted as to the implied-in-law contract claims.

The Court concludes that the Hospitals' action for breach of an implied-in-law contract with BlueCross/BlueShield is pre-empted by ERISA. Under common law theories and the state statute, the Hospitals would be entitled to recover from BlueCross/BlueShield the reasonable value of the emergency services rendered to BlueCross/BlueShield's patients/enrollees in Network S, but for the provisions contained in the federal law, ERISA, which is the exclusive remedy for all claims relating to ERISA plans.

BlueCross/BlueShield is denied partial summary judgment on its assertion that all claims for which the Hospitals received any payment from them on or before November 30, 2008 are time-barred under Tenn. Code Ann. §56-7-110(b). In analyzing the issues, the court confused the ERISA pre-emption doctrine. These claims involve material facts which, when combined with the controlling law under ERISA, preclude summary judgment.

BlueCross/BlueShield is granted partial summary judgment regarding the Hospital's claim for quantum-meruit pursuant to the Hospitals' implied-in-law contract claim.

BlueCross/BlueShield is denied partial summary judgment regarding all but 24 of the 564 "non-ERISA" claims [claims relating to employee-sponsored health plans not governed by ERISA because they are church-related or governmental] because the Hospitals claim BlueCross/BlueShield failed to comply with mandatory ERISA pre-litigation grievance processes that are required to be included in any health care plan. BlueCross/BlueShield's request for partial summary judgment necessitates resolution of material fact disputes and is denied.

The Hospitals are denied partial summary judgment seeking a declaratory judgment that they are deemed to have exhausted all administrative remedies available and that BlueCross/BlueShield's

Network S appeal process is unreasonable, arbitrary or capricious. Contrary to the Hospitals' assertion that the facts are undisputed, resolution of whether the appeals' procedures comport with ERISA requires proof that the notices of adverse benefit determination and denial letters for the claims at issue failed to provide the information required by the ERISA regulations.

All other matters raised by either party seeking partial summary judgment are respectfully denied. IT IS SO ORDERED.

Both parties sought interlocutory review pursuant to Tenn. R. App. P. 9. The appeal was granted, limited to the following issues:

1. Whether HCA's implied-in-law contract claim is preempted by ERISA.

2. Whether BCBST's administrative appeals procedures violate ERISA requirements, thus permitting the hospitals to seek full-billed charges.

3. For the 4,037 claims governed by ERISA, whether all but 145 should be dismissed for failure to exhaust administrative remedies.

4. For all non-ERISA claims, whether Tenn. Code Ann. §56-7-2355 or the Emergency Medical Treatment and Active Labor Act (EMTALA), as amended, 42 U.S.C. § 1395dd, give the hospitals an implied contractual cause of action for *quantum meruit* and, if so, what are its applicable elements and defenses.

5. For the 564 non-ERISA claims, whether all but 24 should be dismissed due to failure to comply with contractual pre-litigation grievance requirements.

6. Whether all claims for which the hospitals received payment from the insurance company on or before November 30, 2008 are time-barred under Tenn. Code. Ann. § 56-7-110(b).

7. Whether claims related to insureds in the insurance company's Network P should be dismissed because the parties have managed-care contracts specifically governing those claims.

## II.    STANDARD OF REVIEW

We review findings of fact by the trial court "de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the

6

preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). This presumption of correctness "applies only to findings of fact, not to conclusions of law[; a]ccordingly, appellate courts review a trial court's resolution of legal issues without a presumption of correctness and reach their own independent conclusions regarding these issues." *Cumberland Bank v. G & S Implement Co., Inc.*, 211 S.W.3d 223, 228 (Tenn. Ct. App. 2006)

The Chancellor's order was based upon the parties' cross motions for summary judgment. A party is entitled to summary judgment only if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits…show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Tenn. R. Civ. P. 56.04. The party seeking summary judgment "bears the burden of demonstrating that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." *Armoneit v. Elliot Crane Service, Inc.*, 65 S.W.3d 623, 627 (Tenn. Ct. App. 2001).

A succinct statement setting forth the standard for considering motions for summary judgment where the moving party does not bear the burden of proof was set forth by this court in *Hall v. Gaylord Entm't Co.*:[4]

> When the moving party does not bear the burden of proof at trial, the moving party may make the required showing and shift the burden of production either "(1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense." *Rye v. Women's Care Ctr. of Memphis, MPLLC*, [477] S.W.3d [235], No. W2013-00804-SC-R11-CV, at *22 (Tenn. Oct. 26, 2015).
>
> ***
>
> If the moving party does satisfy its initial burden of production, "the nonmoving party 'may not rest upon the mere allegations or denials of [its] pleading,' but must respond, and by affidavits or one of the other means provided in Tennessee Rule 56, 'set forth specific facts' *at the summary judgment stage* 'showing that there is a genuine issue for trial.' " *Rye*, [477]

---

[4] Prior to October 26, 2015, courts which were considering motions for summary judgment were to apply the standard set forth in *Hannan v. Alltel Publishing Co.*, 270 S.W.3d 1 (Tenn. 2008) for cases filed before July 1, 2011; for cases filed after July 1, 2011, courts are to apply Tenn. Code Ann. § 20-16-101. On October 26, 2015, in *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 273 (Tenn. 2015), our Supreme Court overruled *Hannan* and adopted a standard for cases filed prior to July 1, 2011, that is consistent with the standard at applicable to Federal Rule 56. Inasmuch as this case was filed June 1, 2010, we apply the standard as directed by the *Rye* court.

S.W.3d [235], No. W2013-00804-SC-R11-CV, at *22 (quoting Tenn. R. Civ. P. 56.06). The nonmoving party must demonstrate the existence of specific facts in the record that could lead a rational trier of fact to find in favor of the nonmoving party. *Id*. If adequate time for discovery has been provided and the nonmoving party's evidence at the summary judgment stage is insufficient to establish the existence of a genuine issue of material fact for trial, then the motion for summary judgment should be granted. *Id*. Thus, even where the determinative issue is ordinarily a question of fact for the jury, summary judgment is still appropriate if the evidence is uncontroverted and the facts and inferences to be drawn therefrom make it clear that reasonable persons must agree on the proper outcome or draw only one conclusion. *White v. Lawrence*, 975 S.W.2d 525, 529–30 (Tenn. 1998).

*Hall*, No. M2014-02221-COA-R3-CV, 2015 WL 7281784, at *4-5 (Tenn. Ct. App. Nov. 17, 2015) (emphasis in original) (footnotes omitted). We review the trial court's ruling on a motion for summary judgment *de novo* with no presumption of correctness, as the resolution of the motion is a matter of law. *Godfrey v. Ruiz*, 90 S.W.3d 692, 695 (Tenn. 2002); *see also Martin v. Norfolk S. Ry.*, 271 S.W.3d 76, 83 (Tenn. 2008). We view the evidence in favor of the non-moving party by resolving all reasonable inferences in its favor and discarding all countervailing evidence. *Stovall v. Clarke*, 113 S.W.3d 715, 721 (Tenn. 2003); *Godfrey*, 90 S.W.3d at 695.

## III.    DISCUSSION

### ISSUE 1:  WHETHER ERISA PREEMPTS HCA'S IMPLIED-IN-LAW CONTRACT CAUSE OF ACTION

The trial court granted BCBST's motion for summary judgment and dismissed HCA's direct cause of action "because ERISA is the exclusive remedy for all claims relating to an ERISA plan and neither the Hospital nor the Court may avoid the provisions of that statute by reference to a non-ERISA cause of action." HCA asserts that this holding was in error because HCA's direct cause of action does not relate to ERISA benefit plans.

The United States Supreme Court explained the concept of ERISA preemption in *Aetna Health v. Davila*:

Congress enacted ERISA to "protect ... the interests of participants in employee benefit plans and their beneficiaries" by setting out substantive regulatory requirements for employee benefit plans and to "provid[e] for appropriate remedies, sanctions, and ready access to the Federal courts." 29 U.S.C. § 1001(b).  The purpose of ERISA is to provide a uniform

8

regulatory regime over employee benefit plans. To this end, ERISA includes expansive pre-emption provisions, see ERISA § 514, 29 U.S.C. § 1144, which are intended to ensure that employee benefit plan regulation would be "exclusively a federal concern." *Alessi v. Raybestos–Manhattan, Inc.*, 451 U.S. 504, 523, 101 S.Ct. 1895, 68 L.Ed.2d 402 (1981).

ERISA's "comprehensive legislative scheme" includes "an integrated system of procedures for enforcement." *Russell*, 473 U.S., at 147, 105 S.Ct. 3085 (internal quotation marks omitted). This integrated enforcement mechanism, ERISA § 502(a), 29 U.S.C. § 1132(a), is a distinctive feature of ERISA, and essential to accomplish Congress' purpose of creating a comprehensive statute for the regulation of employee benefit plans.[5] As the Court said in *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987):

---

[5] ERISA's civil enforcement provision, found at section 502 of the Act and codified at 29 U.S.C. § 1132(a)(1)(B), provides in relevant part:

(a)     Persons empowered to bring a civil action

A civil action may be brought—
(1)     by a participant or beneficiary—
…
(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

The Supreme Court explained this provision in *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 52-53 (1987):

The civil enforcement scheme of § 502(a) is one of the essential tools for accomplishing the stated purposes of ERISA. The civil enforcement scheme is sandwiched between two other ERISA provisions relevant to enforcement of ERISA and to the processing of a claim for benefits under an employee benefit plan. Section 501, 29 U.S.C. § 1131, authorizes criminal penalties for violations of the reporting and disclosure provisions of ERISA. Section 503, 29 U.S.C. § 1133, requires every employee benefit plan to comply with Department of Labor regulations on giving notice to any participant or beneficiary whose claim for benefits has been denied, and affording a reasonable opportunity for review of the decision denying the claim. Under the civil enforcement provisions of § 502(a), a plan participant or beneficiary may sue to recover benefits due under the plan, to enforce the participant's rights under the plan, or to clarify rights to future benefits. Relief may take the form of accrued benefits due, a declaratory judgment on entitlement to benefits, or an injunction against a plan administrator's improper refusal to pay benefits. A participant or beneficiary may also bring a cause of action for breach of fiduciary duty, and under this cause of action may seek removal of the fiduciary. §§ 502(a)(2), 409. In an action under these civil enforcement provisions, the court in its discretion may allow an award of attorney's fees to either party. § 502(g).

> "[T]he detailed provisions of § 502(a) set forth a comprehensive civil enforcement scheme that represents a careful balancing of the need for prompt and fair claims settlement procedures against the public interest in encouraging the formation of employee benefit plans. The policy choices reflected in the inclusion of certain remedies and the exclusion of others under the federal scheme would be completely undermined if ERISA-plan participants and beneficiaries were free to obtain remedies under state law that Congress rejected in ERISA. 'The six carefully integrated civil enforcement provisions found in § 502(a) of the statute as finally enacted ... provide strong evidence that Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly.' " *Id*., at 54, 107 S.Ct. 1549 (quoting *Russell, supra*, at 146, 105 S.Ct. 3085).

> Therefore, any state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted. *See* 481 U.S., at 54–56, 107 S.Ct. 1549; see also *Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 143–145, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990).

542 U.S. 200, 208-209 (2004) (emphasis in original).

In the interest of clarity, at the outset we address the two categories of preemption that may apply when considering the effect of ERISA on state law causes of action – complete preemption and conflict preemption. Complete preemption is "a description of the specific situation in which a federal law not only preempts a state law to some degree but also substitutes a federal cause of action for the state cause of action." *Schmeling v. NORDAM*, 97 F.3d 1336, 1342 (10th Cir. 1996).[6] Conflict preemption, on the other hand, codified at 29 U.S.C. § 1144, "allows a defendant to defeat a plaintiff's state-law claim on the merits by asserting the supremacy of federal law as an affirmative defense." *Cmty. State Bank v. Strong*, 651 F.3d 1241, 1261 n.16 (11th Cir. 2011). In their briefs on appeal, BCBST has argued, and HCA defended, that conflict preemption applies to defeat HCA's direct state law cause of action; neither party argues that complete preemption applies. Consequently, we address this issue as one of conflict preemption.

---

[6] In *Davila*, quoted *supra*, the Court considered the effect of ERISA on an alleged violation of a duty imposed by state law and held "if an individual, at some point in time, could have brought his claim under ERISA § 502(a)(1)(B), and where there is no other independent legal duty that is implicated by a defendant's actions, then the individual's cause of action is completely pre-empted by ERISA § 502(a)(1)(B)." *Davila*, 542 U.S. at 210.

ERISA's conflict preemption provision, found at 29 U.S.C. § 1144, "preempts 'any and all State laws insofar as they may now or hereafter relate to any employee benefit plan' governed by ERISA." *Thurman v. Pfizer, Inc.*, 484 F.3d 855, 861 (6th Cir. 2007) (quoting 29 U.S.C. § 1144(a)). In *Thurman* the Sixth Circuit Court of Appeals set forth three categories of state law causes of actions that ERISA preempts:

> [S]tate-law claims "that (1) 'mandate employee benefit structures or their administration;' (2) provide 'alternate enforcement mechanisms;' or (3) 'bind employers or plan administrators to particular choices or preclude uniform administrative practice, thereby functioning as a regulation of an ERISA plan itself.' " *Penny/Ohlmann/Nieman, Inc. v. Miami Valley Pension Corp.*, 399 F.3d 692, 698 (6th Cir. 2005) ("PONI") (quoting *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1468 (4th Cir.1996)). With respect to claims that do not fall within these three categories, we continue to follow our prior precedent that focuses on the nature of the remedy sought by a plaintiff.

484 F.3d at 861. Though the parties have mentioned all three categories in their respective briefs, we have determined that the second category is applicable to HCA's direct cause of action.

BCBST asserts that HCA's direct cause of action is a preempted "alternate enforcement mechanism" because HCA obtained benefits under an ERISA plan for the claims at issue as an assignee and is now seeking additional, extra-contractual, extra-ERISA remedies for alleged underpayments. HCA does not specifically address the applicability of the "alternate enforcement mechanism" category in its brief. However, HCA argues generally that its direct cause of action is independent, unrelated to any ERISA plan; as a separate matter, HCA argues that the implied-at-law contract action arises from a direct relationship created by the Emergency Medical Treatment and Active Labor Act ("EMTALA"), codified at 42 U.S.C. § 1395dd, and Tenn. Code Ann. § 56-7-2355. (See discussion of these statutes in Issue 4, *infra*.). HCA asserts it is not seeking to recover benefits under the plan, but instead seeks adequate payment for services that HCA was required to provide and BCBST was required to cover.

In its complaint, after acknowledging recovery of ERISA benefits as an assignee,[7] HCA asserted a separate direct cause of action for implied-in-law contract seeking

---

[7] The assignments of benefits HCA received from plan participants gave HCA the standing and ability to bring actions for underpayment or denial of rights under 29 U.S.C. § 1132(a)(1)(b). *Cromwell*, 944 F.2d at 1277 (holding that "a health care provider may assert an ERISA claim as a 'beneficiary' of an employee benefit plan if it has received a valid assignment of benefits."). For the ERISA-governed claims in the case at bar, HCA brought an action pursuant to 29 U.S.C. § 1132(a)(1)(b), which is not at issue in this interlocutory appeal, as well as its direct cause of action for unjust enrichment.

11

additional recovery for the same services provided to ERISA plan members. As noted in *River Park Hosp. v. BlueCross BlueShield of Tenn., Inc*., 173 S.W.3d 43, 57-58 (Tenn. Ct. App. 2002), an implied-at-law contract claim is premised on a relationship established when a plaintiff confers a benefit on a defendant without a contractual agreement and seeks payment because the circumstances would make it inequitable for the defendant to not pay. In the "IMPLIED CONTRACT/UNJUST ENRICHMENT" portion of the complaint, HCA alleges that "BCBST's contracts with these patients or their employers required payment of in-network benefits for emergency medical services, whether the services were rendered by an in-network provider or an out-of-network provider."[8] The relationship upon which HCA premises its state law cause of action is the relationship established by the insurance contract, governed by ERISA, between BCBST and the patient; HCA seeks to recover a "reasonable reimbursement for [HCA's] provision of emergency medical services" outside of the exclusive enforcement mechanism set forth in ERISA. *PONI*, 399 F.3d at 700. Inasmuch as HCA relies on the relationship between BCBST and the participants in the plans to establish the relationship that is the basis of the implied-in-law contract, we hold that HCA's direct cause of action is an alternative enforcement mechanism to ERISA and is preempted. *Id*. at 698; *Thurman*, 484 F.3d at 861. Accordingly, we affirm the trial court's grant of summary judgment to BCBST and dismissal of HCA's direct cause of action with respect to the ERISA-governed plans.

## ISSUE 2: WHETHER BCBST'S ADMINISTRATIVE APPEALS PROCEDURES COMPLY WITH ERISA REQUIREMENTS

ERISA requires that every employee benefit plan shall "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied" and "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review." 29 U.S.C. § 1133. Requirements for such review procedures are contained in 29 C.F.R. § 2560.503-1. Subsection (g) of the regulation, "Manner and content of notification of benefit determination," sets forth the information required to be included in a written or electronic notification of an adverse benefit determination; subsection (h) "Appeal of adverse benefit determinations," requires that every benefit plan have a procedure through which a claimant can appeal an adverse benefit determination and receive a full and fair review; and subsection (1) provides that "a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of the Act" when a plan fails "to establish or follow claims procedures consistent with the requirements of this section."

HCA relied upon 29 U.S.C. § 1133 and the implementing regulation to argue before the trial court that BCBST's ERISA-governed employee benefit plans failed to

---

[8] BCBST's response to this allegation was "BCBST admits that members of Network S have insurance contracts or employer-sponsored health plans that provide certain coverage for health care."

comply with certain regulations, and therefore, HCA did not have to exhaust BCBST's administrative remedies process before bringing suit as assignee of the plans' benefits. HCA sought a declaratory judgment to this effect and moved for summary judgment on the same. The trial court denied HCA's motion, holding that factual disputes precluded a ruling because "whether the appeals' procedures comport with ERISA requires proof that the notices of adverse benefit determination and denial letters for the claims at issue failed to provide the information required by the ERISA regulations."

Before we can determine whether BCBST's administrative appeals process comports with ERISA, we must determine whether we have jurisdiction over this subject matter. Section 502 of ERISA, found at 29 U.S.C. § 1132, is the "civil enforcement" provision of ERISA. It reads in pertinent part that:

> **(a) Persons empowered to bring a civil action**
> A civil action may be brought--
> **\*\*\***
> **(3)** by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan;
>
> \*\*\*
>
> **(e)(1)** Except for actions under subsection (a)(1)(B) of this section, the district courts of the United States shall have exclusive jurisdiction of civil actions under this subchapter brought by the Secretary or by a participant, beneficiary, fiduciary, or any person referred to in section 1021(f)(1) of this title. State courts of competent jurisdiction and district courts of the United States shall have concurrent jurisdiction of actions under paragraphs (1)(B) and (7) of subsection (a) of this section.[9]

29 U.S.C.A. § 1132(a)(3), (e)(1). The Sixth Circuit Court of Appeals has noted that "Section 1132(a)(3) allows a party to bring a civil action for relief when the [notice and review] requirements of § 1133 are not met," *Stuhlreyer v. Armco, Inc.*, 12 F.3d 75, 78 n.2 (6th Cir. 1993) (citing *Tolle v. Carroll Touch, Inc.,* 977 F.2d 1129, 1135 (7th Cir. 1992)); *accord Parkridge Med. Ctr., Inc. v. CPC Logistics, Inc. Grp. Ben. Plan*, No. 1:12-CV-124, 2013 WL 3976621, at \*8 (E.D. Tenn. Aug. 2, 2013). Thus, Section 1132(a)(3), not section 1132(a)(1)(B), is the vehicle by which HCA may seek relief from

---

[9] Subsection (a)(7), not applicable here, permits a civil action to be brought **"**by a State to enforce compliance with a qualified medical child support order (as defined in section 1169(a)(2)(A) of this title)." Such actions may be heard by state or federal courts.

BCBST's allegedly ERISA-violating appeals procedures. However, state courts are not vested with jurisdiction to hear a cause of action brought pursuant to section 1132(a)(3). We concur with our sister court, the Colorado Court of Appeals, which has held, "[T]he federal courts have exclusive jurisdiction to address violations of this ERISA provision [§1133]." *Matter of Estate of Damon*, 892 P.2d 350, 357 (Colo. App. 1994), *aff'd,* 915 P.2d 1301 (Colo. 1996).

Because state courts have only been granted jurisdiction to hear causes of action arising under § 1132(a)(1)(B) and (7) and because, as declared in *Stuhlreyer*, 12 F.3d at 78, a cause of action for violations of § 1133 must be brought under §1132(a)(3), only federal courts have subject matter jurisdiction to hear arguments such as that made by HCA that BCBST's administrative appeals procedures do not comply with §1133 and its implementing regulation. We conclude that we are without subject matter jurisdiction to consider this issue; accordingly we vacate the ruling on this matter and dismiss HCA's cause of action seeking a declaratory judgment that it is deemed to have exhausted all administrative remedies available.

### ISSUE 3:  HCA'S FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES WITH RESPECT TO ERISA CLAIMS

BCBST next argues that the court erred in denying summary judgment because HCA failed to exhaust administrative remedies prior to bringing suit, which should result in the dismissal of those claims from the lawsuit. Case law supports BCBST's argument that "the administrative scheme of ERISA requires a participant to exhaust his or her administrative remedies prior to commencing suit." *Cantrell v. Walker Die Casting, Inc.*, 121 S.W.3d 391, 395 (Tenn. Ct. App. 2003) *(quoting Ravencraft v. UNUM Life Ins. Co. of Am.,* 212 F.3d 341, 343 (6th Cir. 2000)); *see also Scott v. Regions Bank*, 702 F. Supp. 2d 921, 932 (E.D. Tenn. 2010) (citing *Miller v. Metropolitan Life Ins. Co.,* 925 F.2d 979, 986 (6th Cir. 1991)).

Issues 2 and 3 are closely related.[10] As noted in our discussion of Issue 2, *supra*, HCA has asserted that BCBST's appeals process does not comply with ERISA regulations, which could possibly excuse its failure to exhaust administrative remedies, s*ee* 29 C.F.R. § 2560.503-1(l), and we have held that the issue must be resolved by a court of competent jurisdiction. In light of the interrelatedness of these issues, we see no reason to address the merits of the third issue certified for appeal. There must be a determination that BCBST's appeals procedure complies with ERISA regulations to resolve the issue of whether failure to exhaust the procedure is excused. Accordingly, it is appropriate that we vacate the Chancellor's ruling in this regard.

---

[10] HCA addresses both issues together in one section of its brief and advanced its "deemed exhausted" argument before the trial court in response to BCBST's position that HCA's failure to exhaust administrative remedies should warrant dismissal.

**ISSUE 4:  WHETHER A CAUSE OF ACTION BASED ON AN IMPLIED-IN-LAW CONTRACT IS AVAILABLE RELATIVE TO CLAIMS NOT GOVERNED BY ERISA**

The fourth issue we are called to resolve arises from the court's grant of summary judgment to BCBST on HCA's implied-in-law contract cause of action.  As to the plans governed by ERISA, the court held that preemption applied; as to the plans not governed by ERISA, the court did not specify the legal basis upon which it was granting summary judgment.  We restate the issue here:

> For all non-ERISA claims, whether Tenn. Code Ann. §56-7-2355 or the Emergency Medical Treatment and Active Labor Act (EMTALA), as amended, 42 U.S.C. § 1395dd, give the hospitals an implied contractual cause of action for *quantum meruit* and, if so, what are its applicable elements and defenses.

HCA argues that BCBST has been unjustly enriched by "paying a cut-rate amount which has no basis in law and is contrary to its longstanding policy" and that BCBST "is thus taking advantage of HCA's obligations under EMTALA to provide emergency care to Network S members to unilaterally impose a draconian discount."  HCA contends that the parties in this case are similarly situated to those in *River Park Hosp. v. BlueCross BlueShield of Tenn., Inc.* and that this Court should find that an implied-in-law contract exists in the instant case as we so found in *River Park*.

The defendants in *River Park* were BCBST and its subsidiary Volunteer State Health Plan, a health maintenance organization which operated under the name "BlueCare" and participated in the State of Tennessee's Medicaid system known as TennCare as a managed care organization ("MCO"); BlueCare had been required to enter a contractor risk agreement with the State of Tennessee in order to become a Tennessee MCO. *River Park*, 173 S.W.3d at 48-49.  Under the terms of the agreement, BlueCare received a monthly payment, known as a capitation payment, for each BlueCare enrollee; in exchange BlueCare was to arrange for medical services for the enrollee.  *Id.* at 48. With respect to emergency care specifically, the agreement stated that "The Contractor shall be required to pay for all emergency medical services which are medically necessary until the clinical emergency is stabilized," but did not set forth the rates which BlueCare would pay for the care. *Id.* at 59.  The plaintiff was River Park Hospital, which provided emergency care to BlueCare's enrollees at discounted rates pursuant to a contract with BlueCare. *Id.* at 49.  The contract expired and River Park began billing BlueCare at non-discounted rates. *Id.*  Instead of paying the full charges, BlueCare paid River Park at the rate that had been set in the expired contract. *Id.*  River Park brought suit against BlueCare alleging unjust enrichment and other theories of recovery. *Id.* at 50.

Trial was bifurcated, and the case proceeded to a determination of whether

15

BlueCare was unjustly enriched by having received payment from the State for enrollees in the TennCare program but paying River Park less than the amount billed for emergency room care for those enrollees. *Id.* at 50-51. Following a preliminary ruling which both parties sought to modify or amend, as well as the taking of additional proof, the trial court held in pertinent part, that:

> By federal law River Park must provide these emergency services to any patient without regard to insurance until the patient is stabilized. BlueCare is legally obligated by its contract with the State to pay for emergency medical services provided to its enrollees. There was no agreement concerning the amount of payment for these emergency services.

*Id.* at 53. The trial court thereupon held that BlueCare had been unjustly enriched under the circumstances presented. *Id.* at 52. This Court affirmed the trial court's ruling that an implied-in-law contract existed between the hospital and BlueCare and remanded the case for a determination of the reasonable rate of reimbursement for emergency medical services provided by the hospital to BlueCare enrollees. *Id.* at 61.

We disagree with HCA's contention that the holding in *River Park* is "squarely on point." Unlike *River Park*, where BlueCare had received payment for each TennCare enrollee and was under an obligation to pay for emergency services rendered to the enrollee, the patients in this case are participants in commercial health benefit plans which include coverage provided by BCBST for emergency medical services, at a level which depends upon the specific plan and the facts and circumstances of each claim.[11] In

---

[11] The non-ERISA plans contain Emergency Care provisions, which set forth the coverage provided to Network S patients and limit the coverage in cases of non-emergencies, that are identical or similar to the following language from the Core-3PPO plans:

E. Hospital Emergency Care Services

Medically Necessary and Appropriate health care services and supplies furnished in a Hospital which are required to determine, evaluate and/or treat an Emergency until such condition is stabilized, as directed or ordered by the Practitioner or Hospital protocol.

1. Covered
**a.** Medically Necessary and Appropriate health care services, supplies and medications necessary for the diagnosis and stabilization of Your Emergency Condition.
**b.** Practitioner services.

2. Exclusions
**a.** Treatment of a chronic, non-Emergency condition, where the symptoms have existed over a period of time, and a prudent layperson who possesses an average knowledge of health and medicine would not believe it to be an Emergency.
**b.** Services received for inpatient care or transfer to another facility once your medical condition has stabilized, unless Prior Authorization is obtained from the Plan within 24

*River Park*, HCA could only seek payment from BlueCare; significantly, and as distinguished from *River Park*, in this case HCA can seek payment directly from the patients it has treated, with the amount it may have received from BCBST operating to reduce the amount for which the patient is responsible. Accordingly, we turn our focus to whether EMTALA[12] and Tenn. Code Ann. § 56-7-2355[13] give HCA a direct cause of

---

hours or next working day.

[12] The relevant text of EMTALA provides:

> If any individual (whether or not eligible for benefits under this subchapter) comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either—
>
> (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or
>
> (B) for transfer of the individual to another medical facility in accordance with subsection (c) of this section.

42 U.S.C.A. § 1395dd(b)(1).

[13] Tenn. Code Ann. § 56-7-2355 provides in pertinent part:

> (a) . . . (1) "Emergency medical condition" means a medical condition that manifests itself by symptoms of sufficient severity, including severe pain, that a prudent layperson, who possesses an average knowledge of health and medicine, could reasonably expect the absence of immediate medical attention to potentially result in:
> (A) Placing the person's health in serious jeopardy;
> (B) Serious impairment to bodily functions; or
> (C) Serious dysfunction of any bodily organ or part.
> ***
> (3) "Health benefit plan" means any hospital or medical expense policy, health, hospital or medical service corporation contract, a policy or agreement entered into by a health insurer or a health maintenance organization contract offered by an employer, other plans administered by the state government, or any certificate issued under the policies, contracts or plans. . . .
>
> (b)(1) A health benefit plan shall not deny coverage for emergency services if the symptoms presented by an enrollee of a health benefit plan and recorded by the attending provider indicate that an emergency medical condition could exist, regardless of whether or not prior authorization was obtained to provide those services and regardless of whether or not the provider furnishing the services has a contractual agreement with the health benefit plan for the provision of the services to the enrollee.
>
> ***
> (4) Coverage of emergency services shall be subject to applicable copayments, coinsurance and deductibles.

action against BCBST for unjust enrichment.[14]

Our Supreme Court examined EMTALA in *Chattanooga-Hamilton Cty. Hosp. Auth. v. UnitedHealthcare Plan of the River Valley, Inc.*, stating:

> The purpose of EMTALA was to prohibit "patient dumping," that is, "the practice of a hospital that, despite its capability to provide needed medical care, either refuses to see or transfers a patient to another institution because of the patient's inability to pay." *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 873 n.1 (4th Cir. 1992); *see also Beller v. Health and Hosp. Corp. of Marion Cnty., Ind.*, 703 F.3d 388, 390 (7th Cir. 2012). To this end, when a person without the ability to pay for medical services presents to a hospital's emergency room, EMTALA requires the hospital to first provide screening to ascertain whether the person has an "emergency medical condition." If the hospital determines that the person has an emergency medical condition, the hospital must provide such treatment as is necessary to either stabilize the patient or transfer the patient to another facility. *Beller,* 703 F.3d at 390.

475 S.W.3d 746, 750 (Tenn. 2015) (footnote omitted). EMTALA prevents a hospital from turning away emergency patients; it "does not extinguish an emergency patient's

---

[14] HCA has also asserted that 45 C.F.R. § 147.138(b)(2)(ii) applies, arguing that it "bars an insurer from denying coverage for emergency medical services or discriminating based on the provider's network status." This federal regulation reads:

> (b) Coverage of emergency services—
> \*\*\*
> (2) General rules. A plan or issuer subject to the requirements of this paragraph (b) must provide coverage for emergency services in the following manner—
> \*\*\*
> (ii) Without regard to whether the health care provider furnishing the emergency services is a participating network provider with respect to the services[.]

This regulation states its scope as follows:

> If a group health plan, or a health insurance issuer offering group or individual health insurance coverage, provides any benefits with respect to services in an emergency department of a hospital, the plan or issuer must cover emergency services (as defined in paragraph (b)(4)(ii) of this section) consistent with the rules of this paragraph (b).

45 C.F.R. § 147.138(b)(1). We find this regulation to be inapplicable to the facts of this case, as it did not take effect until August 10, 2010, after this lawsuit was filed, and clearly states that "the provisions of this section apply for plan years (in the individual market, policy years) beginning on or after September 23, 2010." 45 C.F.R. § 147.138(c).

obligation to pay for treatment." *El Paso Healthcare Sys., LTD v. Molina Healthcare of New Mexico, Inc.*, 683 F. Supp. 2d 454, 460 (W.D. Tex. 2010).

Tenn. Code Ann. § 56-7-2355 imposes an obligation on BCBST to provide coverage for emergency services received by its participants "regardless of whether the provider furnishing the services has a contractual agreement with the health benefit plan for the provision of the services to the enrollee."

In light of the respective obligations imposed on the parties by these two statutes, we must now consider whether those obligations create an implied-in-law contract between the two. This Court set forth the elements of implied-in-law contracts in *River Park:*

> [C]ontracts implied in law "are created by law without the assent of the party bound, on the basis that they are dictated by reason and justice." *Id.* The Tennessee Supreme Court has recognized that contracts implied in law are also discussed in terms of unjust enrichment, quasi contract, and quantum meruit:
>
> > Actions brought upon theories of unjust enrichment, quasi contract, contracts implied in law, and quantum meruit are essentially the same. Courts frequently employ the various terminology interchangeably to describe that class of implied obligations where, on the basis of justice and equity, the law will impose a contractual relationship between the parties, regardless of their assent thereto.
>
> *Paschall's, Inc. v. Dozier*, 219 Tenn. 45, 407 S.W.2d 150, 154 (1966) [(emphasis removed)]; see also *Whitehaven Cmty. Baptist Church v. Holloway*, 973 S.W.2d 592, 596 (Tenn. 1998) (stating that "[u]njust enrichment is a quasi-contractual theory under which a court may impose a contractual obligation on the parties where one does not otherwise exist"). In order to establish a claim based on this type of contract, the plaintiff must show that (1) a benefit has been conferred upon the defendant; (2) the defendant appreciated the benefit; and (3) acceptance of the benefit under the circumstances would make it inequitable for the defendant to retain the benefit without paying the value of the benefit. *Angus*, 968 S.W.2d at 808 (quoting *Paschall's*, 407 S.W.2d at 155).

173 S.W.3d at 57-58.

Applying these elements to the facts of this case, the duty imposed on HCA by EMTALA and the prohibition imposed on BCBST by Tenn. Code Ann. § 56-7-2355 do

19

not create an implied-in-law contractual relationship upon which to sustain HCA's cause of action. HCA has not conferred a benefit on BCBST; the services were rendered to the patients, none of whom are party to this suit, and they are the ones who received the benefits of medical care provided in HCA's emergency rooms and are obligated to pay for the services.[15] BCBST has not denied coverage for the services covered by the plan to which the participant agreed and for which the participant paid.[16] Without a benefit being conferred on BCCST by HCA, a cause of action for implied-in-law contract cannot be sustained.

Accordingly, we hold that EMTALA and Tenn. Code Ann. § 56-7-2355 do not create a cause of action for implied-in-law contract in this case and therefore affirm the trial court's grant of summary judgment to BCBST and dismissal of HCA's implied-in-law contract cause of action.

### ISSUE 5: WHETHER HCA'S FAILURE TO COMPLY WITH NON-ERISA PLANS' GRIEVANCE PROCEDURES PRIOR TO FILING SUIT SHOULD RESULT IN DISMISSAL

The trial court denied BCBST summary judgment on its defense that HCA failed to comply with grievance procedures prior to filing suit, as required by the terms of the non-ERISA plans. The court held:

> BlueCross/BlueShield is denied partial summary judgment regarding all but 24 of the 564 "non-ERISA" claims [claims relating to employee-sponsored health plans not governed by ERISA because they are church-related or governmental] because the Hospitals claim BlueCross/BlueShield failed to comply with mandatory ERISA pre-litigation grievance processes that are required to be included in any health care plan. BlueCross/BlueShield's request for partial summary judgment necessitates resolution of material fact disputes and is denied.

(Bracketed text in original.) BCBST contends that this holding was in error and asserts on appeal that "HCA's legal contention that BCBST's administrative remedies for the 564 non-ERISA claims did not comply with ERISA is immaterial to claims governed by Tennessee law."

We first consider the effect of the court's reference to the "mandatory ERISA pre-litigation grievance processes" in the context of deciding whether exhaustion of remedies

---

[15] We are not persuaded by HCA's argument that "HCA benefitted BCBST by helping BCBST to fulfill its core obligation to 'improve and sustain the physical, financial and community health of Tennessee."

[16] Tenn. Code Ann. § 56-7-2355(b)(4) allows that "[c]overage of emergency services shall be subject to applicable copayments, coinsurance and deductibles"; thus, the statute contemplates that "coverage" does not necessarily equate to payment in full for emergency medical services rendered.

is required with respect to the 564 non-ERISA claims in this lawsuit.

HCA argues in its brief that other regulations, which "the parties and chancery Court often colloquially referred to as 'ERISA' regulations apply to non-ERISA plans as well . . . because regulations applicable to non-ERISA group health plans (not just those governed by ERISA) also incorporate the requirements of the ERISA regulations (29 C.F.R. § 2560.503-1) by reference." To support this position, HCA cites to 26 C.F.R. § 54.9815-2719T, which is contained in Title 26, "Internal Revenue Service," and 45 C.F.R. § 147.136, which is found in Title 45, "Public Welfare," of the Code of Federal Regulations. [17]

We are not persuaded from our reading of the transcript of the hearing on the motions for summary judgment that the trial court's one-sentence verbal ruling on this matter, which contains a reference to unspecified ERISA regulations, was a "colloquial" reference to federal regulations that are applicable to the non-ERISA plans at issue in this lawsuit. We have reviewed the regulations which HCA cites and observe that both went into effect on September 21, 2010, more than three months after HCA filed the present suit. Both regulations contain the language that "the provisions of this section apply for plan years beginning on or after September 23, 2010." Exhibit 5-A to the second affidavit of Kelly Paulk, Director of Product Strategy for BCBST, shows that, with respect to the non-ERISA claims at issue, the latest date healthcare services were rendered was February 17, 2010; this fact is not disputed. Thus, the plan years for these non-ERISA claims would have begun prior to September 23, 2010, and the regulations do not apply to the non-ERISA plans. HCA has not cited, and our research has not revealed, a Tennessee statute or regulation similar to 29 C.F.R. § 2560.503-1(l) that would allow a court to determine that a participant can be deemed to have exhausted administrative remedies available under an insurance plan when that plan "fails to

---

[17] 26 C.F.R. § 54.9815-2719T, which went into effect on September 21, 2010, contained the following provision:

> (g) Applicability/effective date. The provisions of this section apply for plan years beginning on or after September 23, 2010. See § 54.9815–1251T for determining the application of this section to grandfathered health plans (providing that these rules regarding internal claims and appeals and external review processes do not apply to grandfathered health plans).

45 C.F.R. § 147.136, which also went into effect on September 21, 2011, contains nearly identical language:

> (g) Applicability date. The provisions of this section apply for plan years (in the individual market, policy years) beginning on or after September 23, 2010. See § 147.140 of this part for determining the application of this section to grandfathered health plans (providing that these rules regarding internal claims and appeals and external review processes do not apply to grandfathered health plans).

establish or reasonable claims procedures." 29 C.F.R. § 2560.503-1(l). For the plans governed by ERISA, § 2560.503-1(l) allows such a determination, but as to the non-ERISA plans, there is no comparable Tennessee statute or regulation. Consequently, the plan participant or HCA, as assignee, was required to exhaust the grievance procedure regarding these 564 claims before filing suit.

Of the 564 claims, BCBST contends that grievance procedures were initiated on only 24 and that the remaining 540 claims should be dismissed. [18] Of the 540 claims, it is not clear from the record whether the time period for filing grievance procedures had expired for six claims which were made arising from the State Plan or State Teachers Active plan because BCBST's list of non-ERISA claims, contained in Exhibit 5-A, does not contain the date of BCBST's adverse benefit determination.[19] Accordingly, we remand those six claims for a determination by the trial court whether the time period for initiating the grievance procedure has expired and for further proceedings as to those claims for which the time period has not expired.

Excluding the 24 claims on which administrative appeals were initiated and the 6 claims arising out of the State Plan or the State Teachers Active Plan, we hold that summary judgment should have been granted on the remaining 534 non-ERISA claims because neither the patient nor HCA, as assignee, initiated grievance procedures before suit was filed. We enter judgment for BCBST on those claims and remand this matter for further proceedings as to the remaining 24 claims (as listed in BCBST's Exhibit 6-B).

---

[18] Our review of the 564 claims for coverage under the non-ERISA plans was aided by examining Exhibit 5-A to the Second Affidavit of Kelly Paulk and Exhibit 6-B to the Affidavit of Shelley Sullivan, both of which were filed under seal in support of BCBST's motion for summary judgment. Exhibit 5-A contains the entire population of claims arising under the non-ERISA plans, and Exhibit 6-B lists the non-ERISA claims for which grievance proceedings were initiated.

[19] From Exhibits 5-A and 6-B, it appears that a few claims existed on which the time period for filing a grievance procedure had not yet expired at the time the lawsuit was filed. Specifically, 6 of the 564 claims involved members of the State Plan or State Teachers Active Plan, both of which permit a grievance proceeding to be initiated within two years of an adverse benefit determination. According to Exhibit 5-A, the latest date of the medical service for any claims made pursuant to either of those plans was December 18, 2009. Thus, at the time this lawsuit was filed approximately six months later, the two-year period had not yet expired. According to Exhibit 6-B, which lists the non-ERISA claims for which grievance proceedings were initiated, none of the six claims arising out of the State Plan or the State Teachers Active Plan were the subject of a grievance proceeding. This exhibit was attached to an affidavit signed on May 3, 2013 and filed with the court on May 15, 2013. Thus, by the time the Chancellor was considering the motion for summary judgment in 2013, it is likely that the two-year period had expired without the initiation of a grievance proceeding to appeal the adverse benefit determination. However, because BCBST's list of non-ERISA claims does not contain the date of BCBST's adverse benefit determination, a factual determination in this regard is needed.

### ISSUE 6: WHETHER 902 OF HCA'S CLAIMS ARE TIME-BARRED UNDER TENN. CODE ANN. § 56-7-110(b)

BCBST contends that the trial court erred in denying summary judgment to BCBST on its defense that Tenn. Code Ann. § 56-7-110(b) is a statute of limitations that bars 902 claims for which HCA received some payment from BCBST on or before November 30, 2008. HCA argues that Tenn. Code Ann. § 56-7-110(b) does not apply because it is not a statute of limitations. To resolve this issue, we look to the rules of statutory construction set forth in *McGee v. Best*:

> The rule of statutory construction to which all others must yield is that the intention of the legislature must prevail. *Mangrum v. Owens*, 917 S.W.2d 244, 246 (Tenn. Ct. App. 1995) (*citing Plough, Inc. v. Premier Pneumatics, Inc.*, 660 S.W.2d 495, 498 (Tenn. Ct. App.1983); *City of Humboldt v. Morris*, 579 S.W.2d 860, 863 (Tenn. Ct. App. 1978)). "[L]egislative intent or purpose is to be ascertained primarily from the natural and ordinary meaning of the language used, when read in the context of the entire statute, without any forced or subtle construction to limit or extend the import of the language." *Mangrum v. Owens*, 917 S.W.2d at 246; (*quoting Worrall v. Kroger Co.*, 545 S.W.2d 736, 738 (Tenn. 1977)). The Court has a duty to construe a statute so that no part will be inoperative, superfluous, void or insignificant. The Court must give effect to every word, phrase, clause, and sentence of the Act in order to achieve the Legislature's intent, and it must construe a statute so that no section will destroy another. *Id*. (*citing City of Caryville v. Campbell County*, 660 S.W.2d 510, 512 (Tenn. Ct. App. 1983); *Tidwell v. Collins*, 522 S.W.2d 674, 676 (Tenn. 1975)).

106 S.W.3d 48, 64 (Tenn. Ct. App. 2002).

Tenn. Code Ann. § 56-7-110 is part of the general provisions of Chapter 7 of Title 56, which governs insurance and is concerned with payment errors occurring between health care providers and health insurance entities[20]; subsection (b) reads as follows:

> A health insurance entity shall not be required to correct a payment error to a health care provider if the provider's request for a payment correction is filed more than eighteen (18) months after the date that the health care

---

[20] Tenn. Code Ann. § 56-7-110 was amended in 2009, and therefore different versions of the statute were in effect during the time period in which HCA asserts BCBST underpaid emergency room claims. Though the parties have not identified the version(s) of the statute applicable to each of the 902 claims, we apply the 2009 amendment and note that our analysis would be the same under the previous version of the statute.

provider received payment for the claim from the health insurance entity.

As an initial matter, we resolve a dispute between the parties as to the meaning of the term "payment error" in the statute; though subsection (b) uses the term, subsection (a) does not define it. HCA argues that the term "error" as used in the statute arises from "a payment resulting from a mistake or oversight" and that a mistake has not occurred because BCBST's asserted underpayment was intentional. BCBST contends that the term "error" should be defined as "[a]n assertion or belief that does not conform to objective reality; a belief that what is false is true or that what is true is false." In the absence of a statutory definition, we must ascertain the natural and ordinary meaning of the word "error." To do that, we utilize the Webster's dictionary definition of "error" as "a mistake."[21] Given the purpose of the statute and the various provisions thereof as more fully discussed below, we construe the phrase "payment error" in subsection (b) to mean a "payment mistake" arising between a health care provider and a health insurance entity.

Subsection (a) contains definitions applicable to the part, including "recoupment," which occurs when a health insurance entity takes action "to recover amounts previously paid to a health care provider by withholding or setting off the amounts against current payments to the health care provider." Tenn. Code Ann. § 56-7-110(a)(5). Subsections (c) through (g) address the time periods for correction of errors and notice requirements imposed on health insurance entities who seek to recoup overpayments; specifically, subsections (d), (e), and (g) impose notice requirements where a health insurance entity has determined to recoup payments previously made, and subsections (c) and (f) set forth the time periods in which a health insurance entity may recoup payments. Reading the subsections together, subsection (b) relieves the insurance entity from having to correct a payment mistake if the provider has not requested the correction within 18 months after the provider received payment, while subsection (c) limits the insurance entity to an 18 month period from the date of payment within which to recoup a mistaken payment.

Subsection (b) is not located in Title 28, which sets forth the operation of statutes of limitations generally and establishes periods for specific causes of action. The statute is not phrased like other statutes of limitation, which typically contain language referencing a time period within which an action must be brought,[22] and does not use the term "cause of action" or "action" or specify the time period in which such an action must be brought. Tenn. Code Ann. § 56-7-110 as a whole sets forth a procedure by which a health care provider and a health insurance entity are to resolve payments made by mistake; the statute imposes a duty on the insurance entity to correct mistakes in payment when a provider makes a timely request and allows the insurance entity to recoup amounts mistakenly paid to health care providers. Tenn. Code Ann. § 56-7-

---

[21] *Webster's II New College Dictionary* (3d ed. 2005).

[22] *See,* e.g., Tenn. Code Ann. §§ 28-3-104, -105; 29-28-103.

110(b) is not a statute of limitations, and we affirm the denial of summary judgment to BCBST on this ground.[23]

## ISSUE 7: NETWORK P CLAIMS

BCBST seeks dismissal of 112 of the 4,713 claims at issue, arguing the claims are improperly included in this lawsuit because they arise out of Network P plans and thus do not relate to Network S, which is at issue in this case. The Chancery Court did not specifically address these 112 claims but generally denied BCBST's motion for summary judgment by holding that "[a]ll other matters raised by either party seeking partial summary judgment are respectfully denied."

We have reviewed BCBST's statement of undisputed facts, HCA's responses thereto, and the materials referenced in both; in these materials as well as its brief, HCA concedes that 47 claims should not be included in this case because 34 of the 112 claims involve Network P and an additional 13 are duplicative.[24] Accordingly, these 47 claims should be dismissed from this lawsuit.

HCA asserts that there are genuine issues of fact as to which network the remaining 65 claims belong. We have reviewed the proof cited by HCA and conclude that it establishes a genuine issue of material fact which precludes summary judgment on these 65 claims.[25]

---

[23] The parties have not distinguished whether these 902 claims arose from self-insured ERISA plans or non-ERISA plans. "Self-insured ERISA plans . . . are generally sheltered from state insurance regulation." *UNUM Life Ins. Co. of Am. v. Ward*, 526 U.S. 358, 367 n.2 (1999) (citing *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 747 (1985)). Because we have held that statute does not operate as a statute of limitations, we make no determination of whether ERISA would have preempted the application of Tenn. Code Ann. § 56-7-110(b), as applied to any self-funded ERISA plans present in the population of 902 claims.

[24] In relevant part, HCA's responded to BCBSTs statements of undisputed material facts:

111. The Plaintiffs admit that they have mistakenly included claims relating to Network P in the claims population for this lawsuit, and representatives of the Plaintiffs admit that such claims are not properly part of this lawsuit. Ex. 4 to Amended Mot. For Partial Summary Judgment, Second Affidavit of Robert F. Parsley ("Second Parsley Aff."), PP2-3 & Exs. 4-A – 4-B.

Response: Disputed in part. The Hospitals admit that of the 112 claims that allegedly fall under Network P, 47 of these claims should be removed from the claims set. The Hospitals dispute that the remaining 65 claims are in fact under Network P. *See* Affidavit of Angelia Wright, filed herewith.

[25] In this regard, HCA cited the statement in Ms. Wright's affidavit that "In a large number of these 65 claims, the patient showed an insurance card for Network S. In a few of these claims, a review of the BCBST website inconsistently showed Network P as the patient's network."

In light of the parties' agreement that 47 claims were mistakenly included in the claims population, we grant summary judgment on these claims. With respect to the remaining 65 claims, the evidence presented establishes a genuine issue of fact as to whether these claims fall under Network S or Network P, and summary judgment was properly denied. We remand this matter for further proceedings in the trial court with respect to these 65 claims.

## IV.   CONCLUSION

For the foregoing reasons, we:

(a) affirm the dismissal of HCA's state law cause of action for implied-in-law contract as to the ERISA-governed plans on the basis that ERISA preempts this cause of action and as to the non-ERISA claims on the ground that the duties imposed on HCA by EMTALA and BCBST by Tenn. Code Ann. § 56-7-2355 do not create an implied-in-law contractual relationship;

(b) vacate for lack of subject matter jurisdiction those portions of the April 22, 2014 order in which the trial court considered whether the administrative appeals procedures related to the ERISA plans complied with applicable regulations;

(c) grant summary judgment to BCBST that 534 non-ERISA claims are barred for failure to exhaust administrative remedies, and remand for the trial court to determine whether the time for filing grievance procedures has expired for the six claims for coverage made under the State Plan and State Teachers Active Plan and for further proceedings on all claims for which grievance procedures were timely initiated;

(d) affirm the denial of summary judgment to BCBST on its asserted defense that 902 claims are barred by the application of Tenn. Code Ann. § 56-7-110(b);

(e) affirm the denial of summary judgment on 65 of the 112 claims which are alleged to be Network P claims and grant summary judgment as to the remaining 47 claims, which are indisputably Network P claims.

 

_____
RICHARD H. DINKINS, JUDGE