In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-3691

JOSHUA BELLER, a minor,
by his next friend and mother,
Melissa Welch, et al.,

*Plaintiffs-Appellants,*

*v.*

HEALTH AND HOSPITAL CORP. OF
MARION COUNTY, INDIANA, d/b/a
WISHARD MEMORIAL HOSPITAL, d/b/a
WISHARD AMBULANCE SERVICE,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:03-cv-00889-TWP-TAB—**Tanya Walton Pratt**, *Judge.*

ARGUED APRIL 20, 2012—DECIDED DECEMBER 20, 2012

Before MANION, ROVNER, and WILLIAMS, *Circuit Judges.*

ROVNER, *Circuit Judge.* The plaintiffs brought suit
alleging that the defendant, Health and Hospital Corpora-
tion of Marion County, Indiana d/b/a Wishard Memorial

Hospital d/b/a Wishard Ambulance Service ("Wishard") violated the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, by failing to stabilize Melissa Welch and her minor son, Joshua Beller, during an emergency medical situation. The district court granted summary judgment for Wishard, and the plaintiffs appeal.

On June 14, 2001, Melissa Welch called 911 and a Wishard ambulance was dispatched to her home. Welch was 34 weeks pregnant, and the paramedics ascertained that her water broke and she had a prolapsed umbilical cord. The paramedics tried to relieve pressure on the cord, and after consulting with the nurse at Welch's obstetrician's office, agreed that Welch needed to be transported to the nearest hospital. They then contacted the St. Francis Beech Grove ("Beech Grove") emergency room and transported her there. Beech Grove did not have an obstetrics facility. Rather than delivering the baby there, the physician at Beech Grove examined Welch and then sent her in the Wishard ambulance to St. Francis Hospital South. There, Joshua Beller was delivered by Caesarean section, but he had suffered hypoxia resulting in severe brain damage. The plaintiffs allege that Wishard violated the EMTALA by transferring Joshua to Beech Grove instead of stabilizing him by delivering him, and that the failure resulted in his permanent injuries.

The EMTALA was enacted to address the problem of patient "dumping," in which hospitals would not provide the same treatment to uninsured patients as to

paying patients, either by refusing care to the uninsured patients or by transferring them to other facilities. *Johnson v. Univ. of Chicago Hospitals*, 982 F.2d 230, 233 n. 7 (7th Cir. 1993); *Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037, 1039 (D.C. Cir. 1991). EMTALA imposes two duties on hospitals with respect to patients who come to their emergency rooms: first, to provide medical screening for any emergency condition; and second, as to any emergency condition, to stabilize the patient prior to any transfer to another facility. 42 U.S.C. § 1395dd.

The issue in this case is whether the plaintiffs had "come to the emergency room" of Wishard Memorial Hospital when they were transported in the Wishard ambulance. The regulations to the EMTALA, promulgated by the Department of Health and Human Services' Center for Medicare and Medicaid Services ("DHHS), provide a definition of when a person is deemed to have "come to the emergency room," but the 2001 definition in effect at the time of the incident was subsequently amended. Both parties agree that under the 2003 definition, the plaintiffs would not have "come to the emergency room" of Wishard, and therefore the claim could not proceed. The core issue, then, is which definition applies.

The 2001 regulation provides that:

> Comes to the emergency department means . . . that the individual is on the hospital property. For purposes of this section . . . [p]roperty . . . includes ambulances owned and operated by the hospital even if the ambulance is not on hospital grounds.

42 C.F.R. § 489.24(b) (2001). That regulation was later amended in 2003, and although it still provided that an individual in an ambulance owned and operated by the hospital is deemed to have come to the emergency room, it also stated that such person is not considered to have come to the emergency room of that hospital if

> (i) (t)he ambulance is operated under communitywide emergency medical service (EMS) protocols that direct it to transport the individual to a hospital other than the hospital that owns the ambulance . . . [or] (ii) [t]he ambulance is operated at the direction of a physician who is not employed or otherwise affiliated with the hospital that owns the ambulance.

42 C.F.R. § 489.24(b) (2003). The Wishard ambulance was operating under EMS protocols at the time it transported the plaintiffs to Beech Grove, and therefore under the 2003 amendment the plaintiffs would not be deemed to have come to the Wishard emergency room by their presence in that ambulance.

Because the 2003 amendment occurred after the incident, the question is whether it can be applied retroactively in determining whether the plaintiffs had come to the emergency room at Wishard under the EMTALA. In *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 208-09 (1988), the Supreme Court held that an administrative agency may not promulgate retroactive rules unless Congress has provided the agency with express authority to do so and, even if such authority is given, an agency rule will not be accorded retroactive effect unless the agency uses language in the rule expressly

requiring that result. We have recognized, however, that not all rules create substantive changes. Some rules simply clarify unsettled or confusing areas of law and rather than changing the law, those rules merely restate what the law has always been according to the agency. *Clay v. Johnson*, 264 F.3d 744, 749 (7th Cir. 2001). Such a clarifying rule "can be applied to the case at hand just as a judicial determination construing a statute can be applied to the case at hand," and does not raise issues of retroactivity. *Id.; Middleton v. City of Chicago*, 578 F.3d 655, 633 (7th Cir. 2009). Therefore, the dispositive question is whether the 2003 amendment of the definition of "comes to the emergency department" was merely a clarification of the meaning of that phrase, or whether it presented a substantive change in the definition.

The district court held that the amended definition of "comes to the emergency department" was a clarification that applied retroactively, and granted summary judgment in favor of the defendant. In so holding, the court gave deference to the DHHS' characterization of the 2003 amendment as a clarification, and concluded that the amendment was intended to alleviate confusion surrounding hospital-owned ambulances operating under the EMS protocols. On appeal, the plaintiffs challenge both of those bases. They argue that it is not clear that the DHHS in fact considered the 2003 amendment to be a clarification. Moreover, they assert that even if the DHHS did characterize it as a clarification, the district court gave undue deference to that determination and erred in failing to conduct its own analysis to ascertain whether the amendment was a substantive change or a clarification.

In determining whether a rule constitutes a change in law or a clarification of existing law, the intent of the promulgating agency must be accorded great weight. *Clay*, 264 F.3d at 749. We therefore will defer to an agency's expressed intent that a regulation be deemed a clarification unless the prior interpretation of the regulation is "patently inconsistent" with the later one. *Id.*

We agree with the district court's conclusion that the DHSS considered the 2003 regulation to be a clarification of the definition of "comes to the emergency department." In its Final Rule implementing the 2003 amendment, the DHHS repeatedly stated that the changes were clarifications in order to address confusion as to the scope of the 2001 definition. In fact, the title states "Clarifying Policies Related to the Responsibilities of Medicare-Participating Hospitals in Treating Individuals With Emergency Medical Conditions." 68 FR 53222. The Final Rule explicitly states that it "both reiterated the agency's interpretations under EMTALA and proposed clarifying changes relating to the implementation of the EMTALA provisions." *Summary*, 68 FR 53222. It indicated that the "reiterations and clarifying changes are needed to ensure uniform and consistent application of policy and to avoid any misunderstanding of EMTALA requirements by individuals, physicians, or hospital employees." *Id.* Moreover, in addressing the definition of "comes to the emergency department" specifically, DHHS stated "we proposed to clarify, at proposed revised § 489.24(b), in paragraph (3) of the definition of 'Comes to the emergency department,' an exception to our existing rule requiring EMTALA ap-

plicability to hospitals that own and operate ambulances. We proposed to account for hospital-owned ambulances operating under communitywide EMS protocols." *XII. EMTALA Applicability to Hospital-Owned Ambulances (§ 489.24(b)) B. Provisions of the Proposed Rule,* 68 FR 53256. The DHHS then proceeded again to refer to its rule as a "proposal to clarify that EMTALA does not apply to a hospital-owned ambulance when the ambulance is operating under communitywide protocols that require it to transport an individual to a hospital other than the hospital that owns the ambulance." *XII. EMTALA Applicability to Hospital-Owned Ambulances (§ 489.24(b)), C. Summary of Public Comments and Departmental Responses,* 68 FR 53256.

Those statements are unambiguous, and we agree with the district court that the DHHS considered the 2003 amendment to be a clarification rather than a substantive change. We defer to that determination unless the 2001 definition is patently inconsistent with the 2003 amendment. *Clay*, 264 F.3d at 749.

The plaintiffs nevertheless claim that the DHHS is mistaken in that characterization, and that the two definitions are inconsistent. According to the plaintiffs, the 2003 amendment was a response to a situation not present in 2001—the use of the Emergency Medical Service in determining how ambulances would be directed. With the advent of the EMS protocols, in which ambulances were operated under the direction of those protocols and not under the direction of the hospital owning the ambulance, questions had arisen as to

whether the individual in such an ambulance would be considered to have come to the emergency room of the hospital that owned the ambulance. The amendment was designed to address that confusion and set forth a rule for such a circumstance. The plaintiffs point to the advent of the EMS protocols as evidence that the change is a substantive one, arguing that a substantive change was necessary to adapt to that new circumstance. Specifically, the plaintiffs repeatedly assert that the 2001 definition was "plain and simple and had no exceptions: if an individual was in a hospital-owned ambulance, s/he had 'come to the emergency department' of that hospital." According to the plaintiffs, the 2003 definition created two exceptions for the 2001 definition, thus fundamentally changing, rather than clarifying, the meaning of "comes to the emergency department."

That characterization of the 2001 definition by the plaintiffs ignores its plain language. The 2001 definition stated that a person "comes to the emergency department" if the person is on hospital property, and hospital property includes "ambulances owned and operated by the hospital even if the ambulance is not on hospital grounds." The plaintiffs' statement that a person therefore had come to the emergency department if she was in a "hospital-owned ambulance" ignores the second qualifier, which is that the ambulance must be owned "and operated by" a hospital. The 2003 definition clarified what it meant for an ambulance to be "operated by" a hospital. The 2003 amendment specifically clarified the status of two situations in which the ambulance was owned by the hospital but not as a practical matter

operated by the hospital during that time—first in which the ambulance was operated under communitywide EMS protocols that direct it to transport the individual to a hospital other than the hospital that owns the ambulance, and second in which it was operated at the direction of a physician who is not employed or otherwise affiliated with the hospital that owns the ambulance. That is a classic situation of a clarifying regulation. The plaintiffs' exclusive focus on the ownership of the ambulance, and their failure to recognize the 2001 requirement that the ambulance must also be operated by the hospital, misses the critical point. The advent of the EMS protocols caused confusion in that an ambulance could be owned by a hospital but not operated under its direction. The 2003 regulation clarified with respect to that and another recurring situation, that the individuals would not be deemed to have come to the emergency room of the hospital because the ambulance was under the operation of others.

There is nothing inconsistent in the 2003 and 2001 definitions. The two are consistent in holding that an individual will be deemed to have come to the emergency department if that person is in an ambulance owned and operated by the hospital. The 2003 definition merely provided guidance as to what it means for an ambulance to be "operated by" a hospital. The district court properly held that the 2003 amendment is a clarification, which therefore applies in interpreting the meaning of the 2001 language. Because the Wishard ambulance was operating under the EMS protocol at the time the plaintiffs were in it, the plaintiffs had not

come to the Wishard emergency department under the EMTALA, and the plaintiffs' claim cannot succeed. The decision of the district court granting summary judgment in favor of the defendant is AFFIRMED.